Thank you, Deputy. Please be seated, ladies and gentlemen. Good morning to you all and welcome to the Illinois Appellate Court, First Division, First District. And we have one case on our call for today. And I'd like the lawyers to stand up first of all. You can stay at your place. I know we have plenty of attorneys here today. If the appellant's lawyers would stand and tell us our name nice and loud. Oh, you will, counsel. All right. Thank you, Mr. Ford. Other lawyers want to identify themselves or rather not? Thank you, Mr. Eaton. And Frick, counsel.  Thank you, sir. Thank you. All right. Thank you very much. And whoever is going to argue, make sure you state your name when you step up as well so the record can get it straight. What I've decided is to allow 20 minutes for the appellant to begin and then 20 minutes for the appellee to argue their response and the cross-appeal. And then the appellant will get 10 minutes at the end for final word. Now, I don't know, are you going to be arguing the whole case, Mr. Ford, on your own? All right. Let me ask on this side, are you going to divide your time or is there going to be one person? I'll be arguing. You will be, counsel. All right. Well, no need to worry about that then. All right. I'll ask the clerk to call the case, please. 13-2020, consolidated with 13-2035, certain underwriters, Edwards & London v. Epicenter. And good morning again, sir. Your name so the record is very clear. Yes, please, the court, Kevin Ford, on behalf of the appellant, certain underwriters, Lloyds, Mr. Desideri, counsel. The I know you're all very familiar with our arguments and the briefs, which were long, perhaps, but I think necessarily so. I'd like to emphasize, and I certainly have no intention of doing a repeat of the briefs, but I'd like to emphasize that even though there's a lot of facts discussed in our brief, and even though I believe that in our appeal we can sustain an appeal on a manifest way of the evidence basis, the issues here are primarily legal and that the errors that we bring before the court are really judgments in law that are based on facts that are largely uncontested. The facts that we rely on come from the mouths, in the form of e-mails and other statements, from Abbott's agents, employees, brokers. The the other thing I'd like to point out is that. Well, with with one exception, the legal principles that we rely on are very well, very well part of Illinois law. No new law here. And again, the one exception is the issue of the evidence issue in the damage phase. Mr. Ford, one of the main points I think Judge Billick made, and your opponents are relying on, is that the Lloyd's underwriters accepted premium payments on dates that were clearly after the Wall Street Journal article hit the streets. How does that affect our analysis? Well, first of all, there's two ways. Judge Billick was wrong when he determined that they that they still had time, that they were not bound. Secondly, and probably more important, the underwriters thought they were bound. Abbott thought they were bound. So whether they were bound or not, and we think clearly they were, Abbott over and over again said at that time, when it served our interests, that these people are bound. Wait a minute. Let me get a timeline here. They acquired NOLD in March of 2001. Is that correct? Yes. They sent some unsigned applications for this additional premium in February and April of 2001. The Wall Street Journal article came out on 6-1-0-1, and you transmitted or they transmitted a signed application. It was dated, I believe, the last day of May, but transmitted on June 1st of 2001. I think it was dated May the 23rd, actually. That application didn't get to London until the 7th, Your Honor. 6-7. Yes. Now, what was the date of the payment of the premium? It was July. So clearly the premium was paid, I think, July 5th. Yes. That's the correct date. After the Wall Street Journal argument was transmitted to the underwriters, they knew about it. And if they knew about it, they also knew that the answer in the application was wrong. Well, when they accepted, in your words, accepted the premium, that is a perfunctory operation. Money is deposited at Lloyd's, and it's distributed to any underwriters who are on the risk. But whether they accepted the premium or not, at that point, accepting the premium, you have to understand that these underwriters believed that they were on the risk, and they only had one alternative. And this is under the rules of not only the rules at Lloyd's, but also under our Illinois law. After you're on the risk, there's nothing you can do but you can cancel. The only alternative you have is if you have evidence of fraud, you can file a rescission case. So accepting the premium did not indicate any kind of waiver. Excuse me. Under the policy, what was the recourse that the underwriters of Lloyd's had in the event the parties couldn't agree on increased premium? If they could not agree on increased premium, in that situation, Abbott would have to go somewhere else. But Condition R of the policy says basically, you know, when Abbott acquires another company, it appears from the language of Condition R that whoever they acquire, it could be the Frankenstein Pharmaceutical Company with, you know, terrible drugs. They're covered. It's just the premium amount has to get worked out. Right. But if, and I submit, if a competent underwriter had this information, and in that situation, they would say, if you want $90 million in coverage, the premium has got to be $50 million. Counsel, can I ask you? They can set the premium however they want it, assuming there's a meeting of the minds. But my question is, doesn't the policy language, by its very words, automatically cover acquired companies? Yes. Counsel, let me ask you. The experts that testified on Lloyd's practices, I believe it was Mr. Earle, Taylor, and Jackson, didn't they all agree and all say that the underwriters could have refused the additional premiums? They could have made them, oh, you mean refused to accept them. Right. They did not think so. I mean, that was the underwriter's testimony was that they didn't think so. But, again, taking the- I don't understand why you suggest they said they couldn't accept them. Just as Laura is correct, those policies automatically cover them, and it permitted the underwriters to cancel the policy for a variety of reasons, including that the risk had been measurably increased. Now, if they couldn't agree on this premium, I don't care if it was $50 million, if they couldn't agree on the premium, your underwriters had a remedy, cancel the policies. They didn't do it. They accepted the premium and they distributed the premium. Why not waiver? Because they understood their remedies to-they could not, on the basis of a newspaper article, they could not cancel the insurance. They did not believe they could. They believed that they had to do a thorough investigation before they could make that determination as to whether there was a great increase in the risk here. Then why did they agree on premium? They didn't have to. They never-they agreed on premium. They agreed on the amount of the premium before they knew anything. Wait a minute. Before they knew anything. Hold on. It wasn't paid until July the 5th. The article came out on June the 1st, transmitted to you on June the 7th, transmitted to you a month before you accepted the premium. They didn't know anything in that month? That they believed that they were bound and they were locked in. They may very well have believed, but evidently they may have been wrong. And it may be a costly mistake. If Abbott believed they were bound. Abbott-we've cited at least two or three emails from Abbott saying, you're bound. You're bound on June 1. You were bound from the very beginning because under the original policy, they were insured unless you couldn't agree on the premium or until you canceled. Under your original policy, everything that Abbott bought or developed after these policies were entered into were automatically included, subject to the right to increase the premium for the increased risk. So now we have the application, which is really nothing more than a request to increase the premium because of the increased risk, that has a false answer. Do you know of anything that might result in a claim? And the answer, no. They knew about the Wall Street Journal article. They really found out that they agreed that they did. They knew about it, so the answer is false. You get an application, and now when you get the article, you know the answer is false, and yet you set the premium and accept it. When, first of all, they knew it was material, and the answer, the second half, they knew it was false, I don't necessarily agree with you. That's not their testimony. When they saw that article, and they also received at the same time, when they received that article, about the same time they received a press release from Abbott saying there's nothing to it, they also received... Mr. Ford, let me finish. Put yourself in Abbott's position. Do you think Abbott wanted a $50 million premium? Of course they were going to poo-poo the effect of the article, keep the premium lower. So it was to Abbott's advantage to poo-poo that article, but the fact of the matter is they transmitted the article. Your people knew that there might be a claim because of that article. There might be, and that's all that Question 25 asked them to answer, might there be. Assume for a minute that their answer was false and that they knew it was false. Raise it to the level of whatever you want to raise it to. Subsequent to that, knowing they gave you a false answer, accept their premium. Why not waiver? Because they trusted them. Keep in mind another thing. When Abbott sent the application, and they mentioned the Wall Street Journal article, they sent it separately, but they said in the letter, Fendel's letter of June 1, he says, there is a Wall Street Journal article. We know nothing about the facts in that article. Now that, Your Honor, was an absolute lie, and the underwriters had a right to rely on that. Assume that it was. But what did the article say? The article said the FDA was examining Centroid. And what could happen to Centroid based upon that examination? It could be a recall. And this is a recall policy. So you mean to tell me that the underwriters of the law, these sophisticated insurance people, didn't realize that there might be a claim based on that article? At the same time, they were getting these assurances. They were told, just as the application was coming out, in May 28, 29, we cite emails where they tell them, there is nothing new. We know of no claims. Now, if it comes down to the acceptance of the premium as being the deciding factor in a controversy like this, keep this in mind, and I think we're all adults here. We know there was an outright lie in that application three times. No, they lied three times. No, no, no. From the time they bought this company, they knew there was a problem with Centroid. And Centroid was huge. Centroid was at the time, I think, was the third best-selling drug in America. And they knew there were, from the time they negotiated the deal, they knew that there were issues relating to Centroid. They knew that there was a petition filed to ask the FDA to informally keep it on the market. They knew by May that that was denied and that they'd have to file a new drug application. They still filed an application and said, do we know of any possible claim? They said no. And independently, they represented to the underwriters that there is no problem here. Now, that kind of fraud, and when you look at all the cases that say any kind of fraud like that voids the policy, that kind of fraud can't be let up because somebody accepted it. By the way, we treat any notion that it voids the policy. It renders the policy voidable. Yes. Not void ab initio. So you can affirm, you can ratify the policy by continuing under the policy after you have knowledge giving rise to the defense. Here's what they did, Judge. Justice. When they got that article, they immediately hired an investigator. They hired an American lawyer to start investigating that claim. That's in early July. They plowed ahead and, of course, they said he knew that there was a possible claim there. He just started work. Their belief that they had to have a perfect rescissionable claim before they could claim that the policy was void. And they did the responsible thing. They hired independent counsel to go out, to investigate the facts, to make a determination as to whether they had been misled and get in the facts. The newspaper. Counsel, I will read to you Mr. Leahy's testimony. It's on page 71, I believe, of one of the opinions. Okay, so prior to July the 5th, 2001, Mr. Leahy, you knew the regulatory situation surrounding Centroid from reading the FDA orders. Correct? The answer, yes. You knew some people within Abbott knew about the regulatory situation surrounding Centroid prior to the Wall Street Journal article. Correct? Yes. And your clients had formed a belief prior to July the 5th, 2001, that Abbott had concealed material facts from them. Right? Answer? Correct. That was the testimony of your investigation. But at the time, he was just beginning his work, and you saw that other underwriters testified, but we can't cancel a policy based on a newspaper article. Mr. Ford, can I ask you, as far as Mr. Leahy's conduct, he first asked for due diligence about the Kroll acquisition. That's the first thing he asked for as far as due diligence. Then, after Italy suspends Meridia, he asked for due diligence about Meridia. He doesn't even ask for due diligence about Centroid until July of 2002. He was asking all along, Your Honor. I think the record. That's what I gleaned from the information that was given to me. So you dispute that? Yes. I think he was investigating since right from the very beginning. All right. Let me ask you another question. When you began your presentation, you said that your issues are legal and not factual. So do you have any issue with the factual findings of the court in the ruling in this case? Well, the problem is, first of all, yes. We think they're contrary to the manifest way to the evidence. But second, most of the conclusions, the legal conclusions that Judge Billick reached, were just derived from facts that really aren't contested. I mean, these are the words of Abbott, and he came to the wrong conclusion. I know, but you know the standard is, you know, unreasonable, arbitrary, not based on any evidence. So what can you point to in the factual findings of Judge Billick that supplies that standard? That Abbott didn't lie. We know that Abbott lied. He lied and lied. And if you look at the other conclusion, big conclusion that he made, this broker, if you look at Exhibit 57, which is an email from a London broker who was representing Abbott, what he did is he said, after he saw the Wall Street Journal article, he said, he said, two of these people aren't bound yet. He thought everybody else was bound. He said, this document is material. It should have been shown to them, but he didn't show it to them. Then he says, and then he says that, I will tell them, I will get them to sign, I will tell them they are bound. And then he finally concludes, I am your agent. Now, if you accept the fact or believe that they weren't bound at that time, what that means is what Colgate, assuming Abbott didn't think they were bound, what Colgate is telling Abbott, I will lie to them. I will tell them they're bound. That's what his email says. I will tell them they're bound. Now, was he lying? I don't think so. I think everybody thought they were bound. Am I going to get a light here, Your Honor? All right. Are you done? Okay. Any other questions? Yeah, I have one question. Could you tell me on your issue on the post-judgment interest from May the 21st until the entry of the final judgment, how you can distinguish Illinois State Toll Authority versus Harriet Snider Bank? Yes. That case, Your Honor, the proceedings were done done. And there was nothing left to be decided. A formal judgment may not have been entered, but there was nothing left to be decided. Here there was a whole other claim, the claim for pre-judgment interest. Well, we understand that, but there was nothing left to be decided on the amount of the underlying judgment. That had been rendered on the 20th. There was absolutely nothing to be decided on the underlying judgment. You seem to be conflating appealability with finality for the purpose of accruing interest. That's what's bothering us with this issue. We, I think our briefs are complete on that, but my view of the cases is if there's any claims remaining, and appealability is part of the process, I think it's the same concept. If there's anything remaining, then it isn't a final judgment. So you're saying if you have a case where there are, let's say, three counts, and count one, for whatever reason, gets decided first, and the court enters a money judgment on that count, says count one's over, done with, $10 million, judgment is hereby entered in favor of and against, all right? That may not be appealable because there are other counts remaining in the case. However, isn't that a judgment for a purpose of interest starting to accrue? No. What else has to be done with it to make it into a judgment? I don't believe it's a final judgment until if there's, say, for instance, if there's another count, another contract in tort, and there's something left in the case, then I think post-judgment interest starts to run at that time. Thank you very much, Mr. Ford. The FLE. Counsel, your name again for the record, please. Good morning. May it please the court, my name is Lawrence Desideri, and I represent Abbott Laboratories. And, Mr. Desideri, I want to remind you, you're going to be responding and presenting your cross-appeal this time. I understand. Great. Honorable members of the court, after a two-phase bench trial extending over 50 trial days, involving the testimony of 39 witnesses, over 300 exhibits. Counsel, no. Let's get to the issues. You only have 20 minutes. Sure. I think that, Your Honor, to respond to counsel's arguments, first, I think that their appeal is principally factual. They quarrel with the facts and say Judge Billick should have reached different conclusions. Specifically, with respect to whether they're bound or not, the underwriters state in their brief that Judge Billick relied solely on Abbott's expert, Jackson, for his conclusion that they weren't bound. I respectfully submit, Your Honors, that that statement is absolutely untrue.  where he cites himself to what he was relying upon. And what he relied upon in his findings about why underwriters weren't bound was not just expert Jackson. It was on the testimony of underwriters themselves. He quotes admissions by the underwriters in which their own co-lead underwriter testified that he did not waive. He understood that the process was not over at the endorsement stage and that he wasn't waiving the requirement of a signed and dated application. Counsel, address your opponent's firm argument that the answer no to those questions, question number 25, was a lie. It was not a lie. First, it was a factual question. Judge Billick heard extensive testimony from the recipient witnesses. He heard extensive testimony from the experts. And in his order, as he says, he paid particular attention to the demeanor and bias and credibility of the witnesses. And what that testimony showed is what happened from Abbott's perspective is Abbott paid $6.9 billion for NOL. Synthroid was its biggest drug. It was the third biggest prescribed drug, as counsel said, in the country at the time. It had been on the market for 40 years. The FDA was in a fight with NOL because they wanted NOL to do an FDA or an NDA because an NDA permits generics to piggyback on it and the FDA is in favor of generic competition. That's a new drug application. Yes, a new drug application. So Abbott understood all this. It had four regulatory experts working on the situation at the time, one of whom worked for 18 years at the FDA. They were in constant contact with the FDA. Nobody within Abbott viewed this as a potential for a recall. In fact, when Abbott acquired NOL, Mr. Fendel, the insurance fellow, flew to Germany to talk to BASF. He flew to New Jersey to talk to NOL. And he asked them the question, is anybody aware of any recalls here? Everyone said no. NOL actually warranted in the acquisition agreement that they weren't aware of any circumstances that would lead to a recall. Now, they did understand the regulatory situation. But knowing that the whole purpose of it was to ultimately have an NDA on file, to take Synthroid off the market, it had 8 million patients. It takes a year of calibration to take it off the market and at least three doctor's visits. Our people, our experts, honestly believed as they testified. Every single regulatory expert that testified for Abbott testified that they did not believe this was a circumstance that might lead to a recall. And they weren't Abbott employees at the time they testified. Every one of those regulatory recipient witnesses, we also had a testifying expert. But the industry experts that were working at Abbott at the time either worked for competitors or retired. They had no dog in this fight. And they came in and they were asked, did you think this is something that might lead to a recall? No. The whole purpose, we dealt with the FDA. The whole purpose was to get an NDA and keep it on the market and have generics. So absolutely Abbott believed it. It paid $6.9 billion for a drug, for the largest drug in there was Synthroid. So, yes, they believed it. And we had an industry expert that came in and said in the regulatory context, if you understand what the FDA was doing here and what this was all about, Abbott's belief was entirely reasonable. Now, to respond to the question about the no question that I believe Your Honor asked, the underwriters did disagree with that question. In fact, I can cite two underwriter. Berkenshaw testified that when he read question 20, let me back up a second. The underwriters are experts in recall policies. They are not, this is what they do. They testified they were experts in recall policies. They had an investigatory expert, Mr. Leahy, at their disposal. And Mr. Berkenshaw testified the question was at volume 81, page 1539, was the information contained in the Wall Street Journal article materially different than the information contained in question 25 in the answer? His answer was yes. The question was how was it materially different? In my judgment as an underwriter, this should have said yes. So underwriters, Abbott didn't just answer no. Let's assume for a moment that Abbott misrepresented the answer to question 25. They should have answered yes, and they should have disclosed whatever was in the article. Let's take that as a given. At that particular point in time under the policy, what was the underwriter's remedy? Under the policy, the underwriters could have always canceled this policy for no other reason. The way the policy works, and I think, Your Honor, you mentioned this, is under condition R, it's automatically bound. They could have refused to cover no, they could have refused to do anything. They could have increased risk. Forget Synthroid. Just acquiring no increased the risk under the policies, which is why they were charging additional premiums. So at any time, even if they were bound, they could say, you know what, we don't like this risk. And as Judge Billick found, the reason they didn't do that is because then they wouldn't get the $500,000 for no, and they would have to give back the multimillion-dollar unearned premium. I don't want to get into their motives for doing what they wanted to do. I want to know what their remedies were. Their remedies were cancellation, were they not? Yes. Or set the increased premium based on the risk being assumed. Correct. Under the policy. Under the policy. They also had a premium warranty. This is actually scratched on the endorsement. Underwriter Berkenshaw made a condition for the entire market accepting this policy that the premium had to be paid by July 1st. That didn't happen, and they chose not to invoke that particular one. No, we understand. Sometime after they were aware of the loss of return on loss, and after they already believed that your answer was not correct or should have been answered yes, some agreement was made on premium, and premium was accepted. Correct. It was accepted by Levels 1 and 2, I believe, on July 5th, and Level 3 sometime in January of the following year. Yes. But is there any question that the premium was accepted after they knew of the Wall Street Journal article and as Leahy suggested, they had already formed the belief that you had concealed the material fact in your application? It was absolutely uncontested. Mr. Leahy testified to what he testified to, and he also admitted and understand that he had advised his clients in connection with his investigation. So then I take it then your position is waived. They have waived any right to cancel after they accepted premium with knowledge of an alleged misrepresentation. Absolutely. I think that's correct under the McDermott case and the Middleumberg case. The second question I have for him is, your opponent disagrees evidently with the holding of the Illinois State Toll Authority on the question of pre-judgment interest. It's my understanding that when you have an award, a verdict, a report, whatever, that sets the amount of damage and judgment is entered at some later date, that the judgment interest runs from the date of the award, the report, or the verdict, not the final order. Is that your understanding? I think that's plain from the language of the statute and Illinois State Toll Authority. Okay. Now, I want to shift your gears to your 155 point. That's totally discretionary on the part of the trial. Yes, it is. In this particular case, you don't suggest that there was at least a reasonable disagreement between the parties on the question of coverage? I believe there may have been some disagreement potentially early on. What I think is apparent is a matter of law emanates from the quote that Your Honor pointed to before, and that is Mr. Leahy testified that he investigated this for five weeks and testified he fully understood the situation, and what was really important is he also testified that he knew that people at Abbott knew all about this before July 1st, and that underwriters had formed their belief that Abbott had defrauded them. Nonetheless, when they sued us two years later, they advanced as an excuse for failing to rescind for two years that they did not know Abbott knew anything but before July 1st, and that is what Judge Billick calls the turning point in his opinion, and that, I believe, as a matter of law was a pretext because their lawyer testified to the exact opposite, and that exhibit that they rely on, 1319, supposedly had such new information in it. In closing argument, I challenged underwriters' counsel to point out what's new, what is in that 1319 exhibit that they didn't know in June of 2001, and they didn't do it, and summary judgment, or I'm sorry, motion for directive finding. Judge Billick asked them, what is it in this exhibit that you didn't know before accepting the premium, and there was no, they didn't even address it, there is no answer, and that, I believe, is the vexatious delay here that is not a factual issue. It simply emanates from their omissions of their own counsel that when we sought to enforce it, they advanced a rescission position and sought to rebut the ratification with something that was plainly, as a matter of law, a pretext because they weren't waiting to find out what Abbott knew because they already knew what Abbott knew because their own lawyer had testified. There's other testimony from him where he says it was, quote, unquote, clear to him that Abbott knew. The underwriter, co-lead underwriter himself, as we cite in the brief, said that he knew, he understood that everybody who was anybody, particularly, I think it was Muckney, oh, Movers and Shakers, the Movers and Shakers at Abbott understood what was going on at the time. So that was a pretext that was advanced. I believe, in complete bad faith, it was a strategy that I believe was, Mr. Leahy was their adjuster until after Meridia. All of a sudden, they switched gears, Mr. Leahy disappears, and they hired a gentleman named Mr. Holland. Mr. Holland was presented to us as an adjuster that was just seeking to do the right thing and adjust the policy. At trial, we found out that he was really a litigation consultant hired by the underwriters to assist them with a litigation strategy. Counsel, can I ask you about the pre-judgment interest? Yes. One expert testified $150 million would be the number, and one testified that $33 million would be the number. Is that correct? That's correct. Yeah. Now, under the case law, Santa's Best and the other cases that construe that, isn't it something that's supposed to be easily determined, the amount of that kind of pre-judgment interest? Yes. Legally ascertainable and not a some certain, but I believe under the case law that we cite and what distinguishes our situation, Your Honor, from the case, the Santa Claus case, is I think that that argument might hold water if ultimately nobody knew what it was and the judgment came in at $40 million or $50 million. But that's not what happened here. What happened here and what triggered Leahy's interest, or what triggered underwriters to decide they were defrauded, was Mr. Leahy went to a meeting on July 16, 2002, and as you pointed out, he had never asked about centroid documents. He got to that meeting and interviewed avid people for two full days, and by the way, never asked a word about centroid, and he found out that this loss was $125 million and escalated. That's what triggered the sudden interest in centroid. I think the distinction here is this loss was presented to the underwriters as a policy,  they understood it was a multiple of the policy, or at least in excess of the policy limits, and so here ultimately it was determined that avid said it was $155 or $150, and in fact it was. So what we're looking at is an insurer faced with something that it knew was double, far exceeded the policy limits, and in that instance under the Mariucci case that we cite, we believe that the policy limit there sets a sum certain that they know if they lose, they're going to have to at least pay that amount. But our review is abuse of discretion here. You understand that on that issue. I understand that, Your Honor, but if I could just point out from my client's perspective that they brought this insurance 14 years ago and they paid millions of dollars for it. They suffered a loss 11 years ago, okay, and instead of getting the benefit of the bargain of their policy, they got a 10-year litigation odyssey in which they're still in, and during that time frame, if you take a 5% interest rate, which I think underwriters rate of return I'm sure is greater than 5%, but just at 5% through that decade of delay is $41 million that underwriters have gained here instead of performing the policy. Can I ask a question? Yes. How is that relevant to prejudgment interest? Because I think the purpose of the prejudgment interest statute, as the Illinois Supreme Court said, Your Honor, is to prevent injustice, and I think it should be interpreted. You want to use it as a means to recover what you've lost on your money during the period of litigation. The real question was, though, as Justice Connors asked, was the amount easily calculable, and was it known from the very beginning that this claim was equal or greater than policy limit? And they had an expert that said it was $33,200,000 was the claim, which was far below policy limit. And when you have an abuse of discretion standard and there is some evidence in the record to support the judge's decision, that is, damages were not liquidated or easily calculable, then we have to affirm that decision. We don't have any choice. No matter what we'd like to do. I mean, it's what we're obligated to do, to give deference to a trial judge. I mean, that's where you've got me in a pincer, because they do have evidence in the record that they had an expert say that the claim was $33,200,000. They did hire a litigation expert to say that. At the time, that was never said. Right. Does that render the amount of damages non-liquidated vis-a-vis policy limit or not easily calculable? And can it be said that no reasonable human being could have come to the decision Judge Billick did on the exercise of his discretion on the $155,000 damages? We believe under the facts of this case, Your Honor, I would also throw one other factor in there. In fact, I think it's the James Court that we cite. And there was an element of vexatious delay in this case, and I will point that out as well. The vexatious delay here was we spent an enormous amount of time, an enormous amount of effort, an enormous amount of money, disproving this notion that the turning point was ad that didn't know. Okay? And Mr. Leahy admitted at trial, finally, that he knew all the relevant facts. And we got a lot of admissions as well. So one of the factors under the interest statute, in addition to some certain, is vexatious delay. I think it's the James case that we cite. And I think that if vexatious delay is considered in addition to the amount of the damages vis-a-vis the policy limit, I do believe that it's appropriate. And, indeed, in an issue where essentially without interest our insurance benefits are cut in half, and underwriters are – my client can never get the benefit of the bargain here. Their benefits are cut in half, and underwriters only pay half of what they're supposed to pay, simply because they asserted defenses that delayed things, some of which were clearly vexatious. I suppose the other question is, if the delay is litigation strategy, isn't the remedy really under 137 as opposed to under 155? I think it's under both, Your Honor. The James case that we cite in our brief does, because the interest statute mentions vexatious conduct, I think it's relevant to both. And so the James case took it under consideration in both. Any further comment? Thank you, sir. Thank you very much, Madam. Mr. Ford, ten minutes, sir. I wanted to come back to a couple of questions. First of all, Justice Connors, the way he asked for centroid due diligence, July 5th, right the first day on the job, he wanted to know the due diligence of the no transaction because – and he was stonewalled, and we've outlined this in our brief on that information. More important, the question about when they agreed to premium. And I'm not sure I was clear on this, but in our discussion about when they, in your terms, Justice Hoffman, when they accepted premium, the premium was set before they saw that Wall Street Journal article. They agreed to the premium. There were negotiations with the underwriters. They signed off on a draft of the application. They all signed off on that one, and they were told everything in the final copy is exactly the same. So the underwriters scratched all but two of them. And that's if you look at Exhibit 57, Colgate says all but two are bound, and I'll go get them, and I'll tell them they're bound if they have – what he did is he got their signatures, and then he showed them the Wall Street Journal after. But they thought they were bound, and the premium was fixed. The premium was fixed in late May. My important data is the date not when it was fixed, but rather the date it was accepted. It wasn't accepted until July the 5th. It went into their accounts, but keep in mind, the understanding of the parties, and this is found if you look at Exhibits 118 and 119. This is an email from Bader at Abbott, and he says the underwriters are bound on 6-1 at the premium amount in that endorsement. Now, this is Abbott saying they were bound based on – as of that date at that premium, and they cannot cancel. They can't cancel? They cannot cancel. They can cancel a policy any time they want for increased risk. Well, there's various – That's what the policy says. Illinois law says you can't cancel a policy. I don't care what Illinois law says. Section I of that policy says underwriters have the right to cancel this policy at any time for increased risk. And as soon as they saw that article, it should give rise to the notion there's an increased risk. There's another email, I think, also from Bader saying you saw that Wall Street Journal article. This is later. They're all signed. You saw that Wall Street article. That is a notice of a claim under Illinois law. You cannot cancel if you have notice of a claim. Now, ironically, the same document in Abbott's hands is not a notice of a claim. But when the journal article hit, you're saying that that was the equivalent of a claim? That's what Abbott said. Abbott said once you – in one of these emails, in our brief, Abbott says you have notice of a claim based on the Wall Street Journal article. And they don't say the Wall Street Journal article. They say you have notice of a claim. But if you dig through the – trace it into the testimony, they're referring to the Wall Street Journal article. And, therefore, you cannot cancel. It's simply this, Judge. They cannot cancel. You're suggesting – I want to understand this. Did the sophisticated underwriters of Lloyd accept their legal advice from their insurance? I am saying that – Now, you and I both know that isn't true. I am saying that the underwriters believed they were all on the risk. They all testified to this. Because Abbott told them so?  They believed it because Abbott told them? They believed it because that was their understanding of their obligations under their policy. That's – they all testified. Their policy specifically says they can cancel for an increased risk. And their own investigator says that prior to July the 5th, they believed – they had formed a belief that Abbott had concealed material facts in the answer to question 25. And that they accepted and they took a premium and they cashed it. Regardless of what Mr. Leahy said, every underwriter testified that they believed they were on the risk. They could not cancel. Who does Mr. Leahy work for? He is an independent California lawyer. And he was hired by who? He was hired by the underwriters. So they did not cancel because they thought they could not cancel. What do you have to say about these 155 files? Well, I think it's clear that that's a completely indiscretionary call. Judge Billick found that there was a – this was a bona fide coverage dispute. And, you know, using sound discretion, and it was. It was a very definitely hard-fought dispute about coverage. And as he said, it was a bona fide dispute. So no basis for a vexatious claim. And any further argument on the prejudgment interest? You had here, you had two experts arguing about what the damages were. When you have differences in judgment, and quite interestingly, they're over $100 million apart. And our expert was down almost. We mentioned in the brief $33 million, but there's a $20 million deductible and a copay and everything. So there was such a tremendous difference that that, by definition, is not a liquidated sum. And it is not an easily computed amount. And I think Santa's Brands. Santa's Best. Decided December 21st, 2011, I think. Good timing. Thank you. Thank you very much, sir. Any further? Thank you very much, ladies and gentlemen, for your presentation today. We'll be in touch.